

**FILED**
12/30/2021 AK
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

Morris Tyson,

      Plaintiff,

                                   Case No. 1:21-cv-03504

      v.                              Judge Sharon J. Coleman

Mars, Inc., Exel Logistics, and DHL Express,

      Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

1. Tyson began his employment at the Mars Manteno facility as a temporary employee[1] in 2003 as a Fork Lift & Reach Truck Operator in the warehouse. Tyson then became permanently employed at the Mars Manteno facility in 2004 under the Defendant Mars and Tyson employment/management agreement. ***Exhibit 1***

2. Beginning in 2013 Defendant Mars contracted and employed Kenco to manage the Mars Manteno facility, where Tyson was employed under this contractual arrangement between Defendant Mars and Kenco. ***Exhibit 2***

3. As a term and condition of Tyson's employment he was required to sign an offer letter of employment under Kenco Mars. ***Exhibit 3***

4. In January of 2015, Defendant Mars terminated their employment contract with Kenco. ***Exhibit 4***

---

[1] It was a requisite of the Mars Manteno facility for its employees to be certified to the material handling equipment and spotter standards.

5.    Also in January of 2015, Defendant Mars began engaging Defendant Exel in talks of
      contracting and employing Defendant Exel to manage the Mars Manteno facility.

6.    In on February 13, 2015, Exel offered Tyson conditional continued employment
      opportunities beginning on Mach 2, 2215.  *Exhibit 5*

7.    Tyson's conditional employment offer was based upon the execution of a contractual
      agreement between Defendant Mars and Defendant Exel and;

8.    As a term and condition of his employment, Complainant was once again required to
      sign an offer letter of employment to continue his employment at the now Mars/Exel
      Manteno facility.

9.    On March 2, 2015, Tyson began working under the Mars/Exel at the Mars Manteno
      facility.

10.   Tyson was satisfactorily meeting the legitimate expectations of his employer(s).

11.   In April of 2015, previously filed charges of discrimination against Defendant Mars and
      Kenco were served by the Illinois Department of Human Rights and EEOC at the Mars
      Manteno facility to the then Respondents.

12.   Within days of the service of these charges of discrimination, Tyson began
      experiencing retaliation and adverse employment decisions under his new employment
      relationship with Defendants Exel and Mars that led up to his wrongful termination on
      May 13, 2015.  *Exhibit 6*

13.   Throughout all of Tyson's employment at the Mars Manteno facility, beginning in
      2003, Mars daily supervised, directed and provided all of the necessary resources to
      operate the Mars Manteno facility.

14. Defendant Mars' employment relationship with each of the various management companies, beginning with Tyson constituted and created its own, separate and new legal arrangement or substructure to which Defendant Mars and its various managers operated under.

15. Tyson filed charges of discrimination November of 2015.

16. Well past the time, even into 2016 and beyond, Tyson' employment relationship ended with Defendants Exel and Mars Tyson experienced post-employment discrimination and adverse actions.

17. Defendants Exel and Mars engaged in EEOC investigative process.

18. After a thorough investigation, in October of 2020, letters of determination of Substantial Findings were issued by the EEOC against Defendants Exel and Mars.

    *Exhibit 7*

19. Defendants Exel and Mars refused conciliation efforts.

20. In 2021, the EEOC concluded its investigation and issued Right To Sue Letters against Defendants Exel and Mars.

21. Tyson received the Right to Sue Letters on March 26, 2021.

22. On June 24, 2021, Tyson timely filed his Title VII complaint with the Clerk's office.

    *Exhibit 8*

## ARGUMENT

### PLAINTIFF DISAGREES AND OPPOSES THE THEORY OF RES JUDICATA

Defendant Mars has not met the necessary requirements to support its theory of Res Judicata. The common core or nucleus of operative facts are not the same in the past and present legal proceedings relative to Tyson lawsuit I and II; nor was the employment relationship with Defendant Mars and Tyson the same Tyson lawsuit I and II as it is Tyson III and the current

matter.  In Tyson lawsuit I and II Tyson during the time of adverse employment actions Tyson was employed under Defendant Mars and Kenco's employment arrangement.  ***Exhibits 2, 3 & 4***

In Tyson lawsuit III, during the time of the most recent facts supporting adverse employment actions, Tyson was employed under Defendant Mars and Defendant Exel's 2015 employment arrangement.  ***Exhibit 5***  Also, the cause of action in Tyson III and this matter are not the same.  The current matter before this court is under Title VII.  Title VII requires an administrative requirement that was not completed until 2021.  ***Exhibit*** 9  Failure to exhaust the administrative remedies would have supported a premature filing of these issues under Title VII and resulted in a dismissal.  _Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51 (1938); McCarthy v. Madigan, 503 U.S. 140, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992); Sally v. Hammers, No. 17-1378 (C.D. Ill. May 5, 2018)._  Tyson further points out that during the administrative investigation and proceedings before the EEOC, which ended in 2021, Defendants Exel or Mars did not address any of the issues that it is now referencing in regards to Res Judicata in Tyson lawsuit I, II, or III. _Woodford v. Ngo, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). Citing  Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir. 2002) at 1024 (emphasis in original)._   In addition, Tyson points to the fact that it has been noted by the courts that an employer's EEOC response would not be excluded when offered as an admission of a party opponent.  _ Donley v. Stryker Sales Corp._, 906 F.3d 635, 638 (7th Cir. 2018) that See Fed. R. Evid. 801(d)(2); citing _Starks v. George Court Co.,_ 937 F.2d 311, 314 n.2 (7th Cir. 1991) (using EEOC response as evidence of inconsistencies in employer's reasoning); _E.E.O.C. v. C.G. Schmidt, Inc.,_ 670 F. Supp. 2d 858, 868-69 (E.D. Wis. 2009)

Tyson cannot see in the 12 page motion[2] before the court any meaningful proof to support the claims being made. For example, Defendants have not pointed to any specific facts to demonstrate or support that the doctrine of Res Judicata is appropriate. Defendants' "statements are not supported, and unsupported statements, whether in oral argument or in briefs do not count." _Woolard v. Woolard,_ 547 F.3d 755 (7th Cir.2008); _United States v. Stevens,_ 500 F.3d 625, 628-629 (7th Cir. 2007); _IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,_ 437 F.3d 606, 610-611 (7th Cir.2006); _United States ex rel. Feingold v. AdminaStar Federal, Inc.,_ 324 F.3d 492, 494 (7th Cir.2003); _Campania Management Co., Inc. v. Rooks, Pitts & Poust,_ 290 F.3d 843, 853 (7th Cir.2002)

Tyson declares that these employment and post-employment discriminatory act(s) are different from Tyson's previous claims of employment discrimination in Tyson lawsuit I and II and are proper under the cause of action-Title VII in this scenario before this court that could not have lawfully been sued upon previously until the completion of required judicial administration. _Lawlor v. Nat'l Screen Serv. Corp.,_ 349 U.S. 322, 327–28, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

### TYSON DECLARES THAT HE TIMELY FILED THIS MATTER WITH THE CLERK OF THE COURT

On June 24, 2021, Tyson timely filed his complaint with the Clerk of the Court. On June 25, 2021, Tyson was informed by the Clerk's office that it was an issue with his electronic signature. Tyson promptly corrected that issue with the expectation that it would be timely filed. Exhibit 8- Later that same day on June 25, 2021, Tyson received an email response indicating that there were additional outstanding issues now relating to the civil filing sheet, to which Tyson promptly corrected those issues on that day. Exhibit 8 ¶ 9

Tyson timely filed this matter in good faith with the Clerk's office to be complaintant with the filing deadline on June 24, 2021. However, Tyson did not have control of the Clerk's office

---

[2] The motion presented to Tyson does not have any supporting documentation or exhibits.

and the handling of his complaint after it was at the Clerk's office.  Tyson complied with the

time, acted responsibly, and understands that errors do occur; but maintains that through no fault

of his own that this error occurred.  Tyson understands that this error is detrimental to him, his

case and his constitutional rights and dash Tyson's pursuit of justice.  Tyson also argues that he

is at the mercy of the court to acknowledge the clerical entry mistake and deem his complaint

timely filed.  Tyson also argues that Defendants were not harmed or prejudiced by this clerical

error.

       THEREFORE, for the above reasons Tyson PRAYS that this Honorable Court will deny

the Defendants motion.

Dated: December 30, 2021

                                      Respectfully,

                                      Morris Tyson

                                      /s/ Morris Tyson_____
                                      Morris Tyson
                                      1955 Meadowview Ave.
                                      Kankakee, IL 60901
                                      Tel: 815/295-4592
                                      E-Mail: Morris60901@yahoo.com
                                      Plaintiff ( *pro se* )

## <u>CERTIFICATE OF SERVICE</u>

I, Morris Tyson, hereby certify that on December 30, 2021, a true and accurate copy of Plaintiff's Response to Defendants Motion to Dismiss was served upon all parties of record via the Court's CM/ECF electronic system to the following:

Ryan L. Young
SEYFARTH SHAW LLP
223 S. Wacker Drive, Suite 8000
Chicago, IL 60606

Respectfully,

Morris Tyson
/s/ Morris Tyson_____
Morris Tyson
1955 Meadowview Ave.
Kankakee, IL 60901
Tel: 815/295-4592
E-Mail: Morris60901@yahoo.com
Plaintiff ( *pro se* )

**Exhibit 1**

4 T's MANAGEMENT

125 Sycamore Road/Manteno, IL 60950
Tel. 815-468-9999 • Fax 815-468-1979



SUBJECT:     CMV Driver Transfer

REFERENCE:   Morris Tyson
             S.S.

TO WHOM IT MAY CONCERN:

This letter is to certify that Morris Tyson has transferred from 4T's Mgmnt. to Kenco Logistic Services on April 21, 2013 at which time Kenco assumed the warehouse contract at the Mars facility in Manteno, IL. This is an operation conducted on private property with unlicensed power units.

The above named driver was hired on 1-19-2004 by 4T 's Mgmnt. and has been re-qualified as a Spotter Driver for Kenco Logistic Services, LLC. He successfully completed driver background evaluations, a Pre-Employment Drug Screen and DOT Physical. He is being placed in the Kenco Management Services company random drug and alcohol testing program. Kenco Management Services Risk Management will be maintaining his file according to KQMS Controlled Procedures.

Has this driver had any of the following during his employment?

Alcohol test with a result of 0.04 or higher alcohol concentration?           No
Verified positive drug tests?                                                  No
Refusals to be tested (including verified adulterated or substituted
    drug test results)                                                         No

Has this driver been involved in any commercial motor vehicle accidents?       No
    If yes list below:

_Date_          _Type of Accident_                _Preventable or Non-Preventable_
                      NONE

Sincerely,

Len Szplett
Kenco Logistic Services, LLC
Office Manager
(formerly from 4T's Management)

ULWOOD WAREHOUSE, LLC
PAUL, MN 55108
·783-2013
·645-5744 FAX

TRAILWOOD TRANSPORTATION INC.
MOUNDS VIEW, MN 55112
612-783-9999
612-783-2050 FAX

TRAILWOOD WAREHOUSE, LLC
NEW BRIGHTON, MN 55112
612-783-2040
612-633-8942 FAX

TYSON WISCONSIN
MILWAUKEE, WI 53207
414-747-8420
414-747-8430 FAX

TYSON WAREHOUSE, LLC
TYSON TRUCK LINES, LLC
7 T'S MANAGEMENT, LLC
MOUNDS VIEW, MN 55112
612-786-9099

TYSON PENNSYLVANIA
DISTRIBUTION CENTER
1499 ZEAGER ROAD
ELIZABETHTOWN, PA 17022

**Exhibit 2**

INDEX TO THE 2013 - 2015
WAREHOUSE MANAGEMENT AGREEMENT

Kenco Logistic Services, LLC (Contractor)
and
Mars Chocolate North America, LLC

| Section | Title | Page |
|---|---|---|
| 1. | Scope of Agreement; Entire Agreement | 3 |
| 2. | *Term; Extensions* | 3 |
| | A. Term | 3 |
| | B. Extensions | 3 |
| 3. | Management Services; Standards of Performance; Hours of Operation | 4 |
| 4. | Operating Budget; Operating Expenses | 4 |
| | A. Payment by MARS | 4 |
| | B. Method of Payment | 5 |
| 5. | Management Fee | 6 |
| 6. | Contractor Responsibility for Warehoused Damage and Repairs | 6 |
| 7. | Covenants, Representations and Warranties | 6 |
| | A. Performance Warranty | 6 |
| | B. Compliance with Applicable Laws | 7 |
| | C. Status of Contractor | 7 |
| | D. International Exchange Visitors | 7 |
| 8. | Right, Title and Interest in Goods | 7 |
| 9. | Inbound Shipments; Transfer of Goods; Removal of Goods | 8 |
| 10. | Right of Refusal | 8 |
| 11. | Books, Records, Information and Data | 8 |
| 12. | On-Site Inspection | 9 |
| 13. | Termination | 9 |
| | A. Immediate Termination | 9 |
| | B. Termination After Right to Cure | 9 |
| | C. Termination at Will | 9 |
| | D. Final Accounting | 10 |
| | E. Acts of Insolvency | 10 |
| | F. Rights and Obligations of the Parties on Termination | 10 |
| | G. Operating Agreements | 11 |
| | H. Operating Assets | 11 |
| | I. Employees of Contractor | 12 |
| 14. | Indemnification | 12 |
| | A. By Contractor | 12 |
| | B. By MARS | 13 |
| 15. | Taxes | 13 |
| 16. | Confidential and Proprietary Information; Publicity | 14 |
| | A. Proprietary Information | 14 |
| | B. Publicity; Trademarks. etc | 14 |
| 17. | Assignment | 14 |
| 18. | Status as Independent Contractor | 14 |
| 19. | Insurance | 15 |
| | A. Required Coverage | 15 |
| | B. Insurance on Building Contents | 17 |

DEF000001

C.  Product Liability Insurance ..............................................................17
D.  Warehouseman's Legal Liability Insurance ....................................17
E.  Notice of Loss or Damage to Goods................................................17
F.  Reimbursement of Insurance Premiums .........................................17
20. MASTERFOODS USA's Instructions.........................................................18
21. Demurrage and Other Charges for Delay ...................................................18
22. Force Majeure ...............................................................................................18
A.  Force Majeure Defined ....................................................................18
B.  Exclusions from Definition of Force Majeure ...............................19
23. Miscellaneous................................................................................................19
A.  Headings ...........................................................................................19
B.  Severability.......................................................................................19
C.  Cumulation of Remedies .................................................................19
D.  Notices...............................................................................................19
E.  Waiver ...............................................................................................20
F.  Nondiscrimination ............................................................................20
G.  Substance Abuse ..............................................................................21
H.  Choice of Law; Forum.....................................................................21
I.  Financial Statements.........................................................................21
J.  Entire Agreement; Ammendments....................................................20
K.  Non-Solicitation................................................................................21
L.  Preparation.........................................................................................21
M. Attorney's Fees.................................................................................21
N.  Counterparts; Facsimile Signatures.................................................21
O.  Survival..............................................................................................21

Signatures
Appendix A – Final Operating Budget
Appendix B – Scope of Work
        Exhibit 1 – MARS' North American Quality Manual
Appendix C – Operating Assets List
Appendix D - Transition Costs
Appendix E - Vendor Incentive Program

DEF000002

## 2013 WAREHOUSE MANAGEMENT AGREEMENT

THIS WAREHOUSE MANAGEMENT AGREEMENT, dated as of _____, 2013, by and between **Mars Chocolate North America, LLC** , a Delaware limited liability company having a place of business at 800 High Street, Hackettstown, NJ 07840 (hereinafter referred to as "MARS") and Kenco Logistic Services, LLC, having a main place of business located at 2001 Riverside Drive, Chattanooga, TN 37406 (hereinafter referred to as "Contractor"), sets forth the terms and conditions for Contractor's management of the warehouse facility located at 1125 Sycamore Road, Manteno, IL 60950 (hereinafter, the "Warehouse").

## *1.    SCOPE OF AGREEMENT; ENTIRE AGREEMENT*

Subject to the terms and conditions contained herein, MARS hereby engages Contractor to provide the services herein described (and defined in Section 3 as the "Management Services") for the term set forth herein. This Warehouse Management Agreement, and all appendices and attachments incorporated herein by reference (hereinafter, collectively referred to as "the Agreement"), constitute the parties' entire understanding and agreement regarding the subject matter hereof.

## *2.    TERM; EXTENSIONS*

A.    <u>Term</u>.  The term of this Agreement shall commence on April 21, 2013 ("Commencement Date") and expiring on March 31, 2015 ("Expiration Date"), subject to termination pursuant to the terms and provisions of this Agreement (the "Term").

B.    <u>Extensions</u>. MARS shall have the option to extend this Agreement for subsequent terms (hereinafter, "Extension Term(s)") commencing immediately following the Agreement's Expiration Date of the relevant year, with a new Expiration Date to be determined (such dates also being referred to in this Agreement as the "Commencement Date" and "Expiration Date", respectively) exercisable by MARS' written notice of intent to extend (the "Extension Notice") which shall be delivered to Contractor at least ninety (90) calendar days prior to the Expiration Date of the initial Term or then-current Extension Term. MARS may, as part of its notice to Contractor, elect to negotiate new terms and conditions relevant to the Extension Term. Within thirty (30) calendar days after receiving MARS' written notice, Contractor shall deliver to MARS in writing a "Proposed Operating Budget" as described, and for the purpose set forth, in Section 5 hereof. Thereafter, the parties hereto shall promptly enter into good faith negotiations to agree upon the "Final Operating Budget" described in Section 5, and any other amendments to this Agreement with respect to the upcoming Extension Term. If the parties fail to reach agreement on such matters prior to the Expiration Date of the initial Term or then-existing Extension Term, which deadline shall be subject to extension by mutual written agreement of the parties, this Agreement shall expire on the Expiration Date, except as extended for the Transition Period defined below. With respect to each Extension Term, the parties shall execute a new Final Operating Budget covering the Extension Term which shall be attached to this Agreement as <u>Appendix A</u> in substitution of the Final Operating Budget for the expiring Term or Extension Term, and the Contractor shall provide to MARS copies of all insurance certificates evidencing the satisfaction by Contractor of the insurance requirements set forth in Section 19 for the upcoming Extension Term.

Notwithstanding anything in the foregoing to the contrary, the Contractor may, at its option, elect not to extend this Agreement for the ensuing Extension Term by giving MARS written notice thereof (the "Termination Notice") within seven (7) calendar days after receipt of the Extension Notice. In the event that the Contractor gives a Termination Notice, or in the event that the parties fail to reach agreement as

DEF000003

provided in this Section 2B, then, at MARS' election, the Agreement shall be extended and the Contractor shall continue to perform all of its obligations subject to the performance standards and other requirements set forth in this Agreement, as may be amended by the parties, in a responsible, and good-faith manner, with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry for such period of time not to exceed three (3) months after the date that otherwise would have been the Expiration Date of the initial Term or Extension Term, as the case may be, (the "Transition Period"), in order to enable MARS to locate and finalize arrangements for the orderly, uninterrupted and efficient transition of the Management Services to the satisfaction of MARS. During the Transition Period, the Contractor shall provide its full cooperation and assistance as MARS may require in the operation of the Warehouse and the transition of the Management Services to MARS or its designee. During the Transition Period, the Management Fee and other applicable costs mutually agreed upon by both parties payable to the Contractor shall remain the same as that payable during the most recent Term unless otherwise negotiated between the parties, and MARS shall continue to pay or reimburse all Allowable Operating Expenses incurred during and in respect of the Transition Period, subject to the provisions of Section 5 hereof. On the date of expiration of the Transition Period, the Contractor and MARS shall be governed by the provisions of Sections 13D, 13F, 13G, 13H and 13I as if such date were the Expiration Date.

3.   ___MANAGEMENT SERVICES; STANDARDS OF PERFORMANCE;___
     ___HOURS OF OPERATION___

     The Contractor shall, subject to this Agreement, provide warehousing management services with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry including management of the day-to-day operations of the Warehouse, and oversight of the planned operations in the Warehouse, including but not limited to storage, handling, recouping, transportation management (including, but not limited to load building and carrier scheduling) and all other services as mutually agreed between the parties, subject to MARS' performance standards and other requirements set forth in (1) MARS' North American Warehouse Quality Assurance Manual ("Quality Manual"), (ii) the Vendor Assurance Program compiled by Contractor for the Warehouse in accordance with MARS' "Guidelines" and subject to MARS' approval, and (iii) Vendor Competency Standards based upon MARS Warehouse Vendor Competence Review Workbook, which are summarized in Appendix B hereto and in their totality are incorporated by reference into this Agreement. The Quality Manual is furnished to Contractor with this Agreement. The foregoing services, as may be more fully described in Appendix B, and supplemented by Exhibit 1 to Appendix B describing the Scope of Services and benchmarks related to the first 90 days of Contractor's Term shall be referred to herein as the "Management Services". The days and hours of operation of the Warehouse shall be as mutually agreed in writing by the parties hereto.

4.   ___OPERATING BUDGET; OPERATING EXPENSES___

     A.   Payment by MARS. Contractor shall perform the Management Services at all times within the Final Operating Budget adopted in the manner herein provided. Contractor agrees to submit a "Proposed Operating Budget," as specified in Section 2B, which shall identify, describe and quantify, pursuant to the format and other requirements of MARS, all costs, expenses, and charges anticipated to be incurred in connection with operating the Warehouse. The "Proposed Operating Budget" shall be subject to negotiation between the parties, and the agreed budget resulting from said negotiations shall be the "Final Operating Budget" for the applicable period (which is subject to changes in the manner more fully described below). In the event the parties cannot reach agreement on a Final Operating Budget for the applicable Extension Term prior to its Commencement Date, then the Final Operating Budget shall be

DEF000004

deemed to be the prior calendar year's Final Operating Budget until agreement on a new Operating Budget is reached at which time any differences between the prior calendar year's Final Operating Budget and the new Operating Budget for the Extension Term shall be reconciled. Contractor and MARS shall periodically review the Final Operating Budget for a given year as part of the Review of Business Budgets (ROB) process. In such periodic reviews, Contractor and MARS may agree upon changes in the Final Operating Budget, which changes shall be memorialized in writing and approved by the Regional Distribution Manager and all references in this Agreement to the Final Operating Budget shall be deemed to include any such changes. Except as otherwise agreed upon herein, the parties agree that MARS shall be liable only for those specified fees, costs, and charges (hereinafter collectively referred to as "Allowable Operating Expenses") incurred in the operation of the Warehouse which are included in the "Final Operating Budget", and which have been approved for payment by MARS, subject to Section 4B, after submission of invoices by the Contractor. With respect to the Term of this Agreement, the Final Operating Budget is appended hereto as <u>Appendix A</u> and incorporated herein by reference. Such "Allowable Operating Expenses" shall be payable in the first instance, or reimbursable, by MARS. MARS shall not be liable, and shall not be obligated to reimburse Contractor, for any expense of any single item, product or service in excess of two thousand five hundred dollars ($2,500.00) which is incurred by Contractor and is not included in the "Final Operating Budget", unless Contractor shall have obtained the written approval of MARS' Regional Distribution Manager or other authorized MARS personnel in advance of Contractor's incurring such expense, notwithstanding that such item, product or service is utilized by Contractor in operation of the Warehouse. Should Contractor incur such expense, which is not an Allowable Operating Expense and for which MARS should elect not to make reimbursement, Contractor may, at its option, discontinue the activity which has resulted in such expense without penalty or recourse. The Contractor acknowledges that the Final Operating Budget will contain an allotted budget for the payment of needed repairs in the Warehouse, which amount will be determined in the sole discretion of MARS Payments made by Contractor for repairs paid from the allotted repair budget need not be approved in advance by MARS so long as the supporting documentation will justify the need for and amount of the repair. In the event said allotted repair budget has been depleted, Contractor must obtain MARS' approval, , prior to incurring any repair expenses, except that if a repair of an emergency nature arises which must be attended to immediately, MARS shall reimburse Contractor for said repair only if Contractor makes a good-faith effort under the circumstances to notify MARS of the emergency and obtain MARS' approval prior to incurring the cost of the repair. If unable to get any response from MARS despite Contractor's good-faith efforts, Contractor may proceed without prior approval to cause the repairs to be made, but only to the extent reasonably necessary to address the immediate emergency. In addition, certain of Contractor's costs and expenses to be reimbursed during this Agreement shall be described in Appendix D ("Start Up Costs") and Appendix E ("Transition Costs").

       B.   <u>Method of Payment</u>. Contractor shall promptly submit to MARS, or its designee, all invoices for Allowable Operating Expenses with all available supporting documentation meeting MARS' reasonable requirements therefore, and MARS shall review them for approval, which approval shall not be unreasonably withheld or delayed, and if approved, pay such valid invoices, or reimburse Contractor for payment made. MARS shall have the right to disapprove any billed expense (in which event it shall be paid by Contractor and not reimbursed by MARS) if in MARS' reasonable opinion (i) there is no suitable documentation relating to the expense, and the expense or charge is of a sort which usually can be documented, (ii) the documentation does not support the charge or expense, or (iii) the charge or expense is not an Allowable Operating Expense as defined in Section 5A, or has not been approved in writing by MARS' Regional Distribution Manager prior to the expense being incurred.

       Notwithstanding anything herein to the contrary, the Contractor shall be primarily responsible and liable for the enforcement of all rights against all third parties who supply goods or services for the purposes of this Agreement, and the performance of all obligations with respect to such third parties, including the punctual payment of all monies owing to any such third party so as to take full advantage of any and all prompt payment discounts or incentives, and in any event so as to avoid any late payment

DEF000005

penalties or charges or claims for default of payment. In the event that MARS elects to pay any such third party directly due to Contractor's failure to perform its obligations with respect to such third party, including but not limited to, making payment in a timely manner, such payment shall not relieve the Contractor of its obligations hereunder with respect to such third party.

If MARS pays the Contractor for an Allowable Operating Expense or any other approved expense relating to the Warehouse, and the Contractor fails to pay the third party entitled thereto when due, MARS, at its option and without prejudice to any other right or remedy, may elect to pay the expense directly to the third party and to deduct it from any Management Fee or any other monies payable to the Contractor under this Agreement, or to receive from Contractor a refund, forthwith on demand of the amount paid by MARS provided there is not a valid basis for Contractor to withhold payment. MARS will pay all budgeted and properly documented invoices submitted by Contractor within ninety (90) days of the actual receipt date of invoice by MARS with billing done on a weekly basis, provided that MARS may make earlier payments in its sole discretion upon reasonable request by Contractor from time to time for earlier payment in order to take full advantage of any prompt payment discounts or incentives. As long as Contractor has complied with the MARS billing documentation criteria as identified in Section 4 B, MARS will not withhold payment for any alleged billing dispute. MARS shall make payment in full and the parties will work diligently in good faith to resolve any billing discrepancy/dispute in a timely manner. Notwithstanding anything to the contrary contained herein, any claims between the parties shall be handled separate from general invoicing.

## 5.   *MANAGEMENT FEE*

In consideration of the provision of Management Services described herein, and in addition to Allowable Operating Expenses, MARS shall pay to Contractor an annual Management Fee based upon MARS' standards for establishing such Management Fee, as such standards may be amended from time to time in MARS' sole, reasonable discretion provided there is a valid basis to amend the standards and Contractor mutually agrees to such amendment. The Management Fee for the Term shall be 6.5% of the agreed Final Operating Budget for the calendar year, with the exception of pallets, which will incur a fee of 3%. The total will be divided by the number of MARS periods remaining in the calendar year and be equal installments, provided a reasonably detailed invoice is submitted to MARS. Payment of agreed Management Fee shall be in accordance with Section 4B.

## 6.   *CONTRACTOR RESPONSIBILITY FOR WAREHOUSE DAMAGE AND REPAIRS*

Contractor shall be responsible for any damage, repairs or replacements (capital or otherwise, structural or otherwise, but in any such case reasonable wear and tear excepted) to the Warehouse to the extent such damage(s), repair(s) or replacement(s) is/are necessitated solely as a result of any negligent act or failure of Contractor, its employees, and/or agents. contractors, subcontractors, licensees and invitees . Contractor shall not be responsible for damage, repairs or replacement caused by any other party prior to Contractor's Commencement Date. Contractor shall document the condition of the Warehouse upon Commencement and shall provide a report detailing existing damages to MARS.

## 7.   *COVENANTS, REPRESENTATIONS AND WARRANTIES*

A.     Performance Warranty. Contractor covenants, warrants and represents that (i) each of the Contractor, its managers, supervisors, employees, agents and any subcontractors it retains has and will at all times have the requisite experience, capacity, expertise and training necessary to perform the

DEF000006

Management Services in an efficient and effective manner, and shall properly, safely, and efficiently operate and manage the Warehouse for the purposes herein described with a high level of care, skill and diligence and in accordance with recognized warehouse logistic operational best practices supporting the food industry; (ii) it will maintain and keep all equipment used in the Warehouse in good operating order and will ensure that the equipment is operated in a safe manner by employees experienced in its use; (iii) it will strictly comply with the descriptions, representations, limitations and standards of performance as to the Management Services which appear, or are referenced, in this Agreement including any Appendix hereto; (iv) the Contractor, its managers, supervisors, employees, agents and any subcontractors it retains shall perform the Management Services in an efficient manner, with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational best practices supporting the food industry; and (v) Contractor shall maintain and keep in neat and orderly condition, free from damage, deterioration, smell or taste taint, infestation and contamination all such goods as from time to time may be tendered by MARS for storage at the Warehouse in accordance with a high level of care, skill and diligence and consistent with recognized warehouse logistic operational practices supporting the food industry, and that it will strictly abide by (a) the temperature and humidity standards set forth in the Quality Manual, and (b) all housekeeping, sanitation, and pest control standards as set forth in the Quality Manual. The Contractor acknowledges that MARS is materially relying on the above mentioned covenants, representations and warranties, which have induced MARS to enter into this Agreement.

MARS will notify the Contractor in writing of any material amendments to the manuals, standards and programs referred to in this Section and in Section 4 hereof, which amendments are in the sole discretion of MARS provided Contractor is provided advanced notice of such amendments and reimbursed by MARS for any potential financial impact associated with the amendments.

B. Compliance with Applicable Laws. It is understood by Contractor that some or all of MARS' goods tendered for storage in the Warehouse are intended for human or animal consumption and are subject to Federal Food and Drug Administration or Department of Agriculture standards and regulations and other applicable federal, state and local laws affecting the storage and marketing of such products. Therefore, Contractor warrants that, in operating the Warehouse, it shall not violate or permit the violation of any such laws, nor shall MARS ask Contractor to knowingly violate any such laws. Contractor further warrants that it will not place MARS' goods in proximity to any other goods or materials which might lead to any damage, deterioration, contamination, infestation, smell or taste taint of MARS' goods, including packaging.

C. Status of Contractor. Contractor warrants and represents that it is a legal entity, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in the jurisdiction where Contractor will perform the Management Services under this Agreement.

D. International Exchange Visitors. Contractor shall not utilize the J1 Visa International Exchange Visitors program established by the United States Government to provide labor relating to the Services under the Agreement without the prior written consent of Mars.

## 8. *RIGHT, TITLE AND INTEREST IN GOODS*

Contractor acknowledges that it does not have, nor will it have at any time, any right, title or interest, and Contractor expressly waives any right to seek or assert a warehouseman's lien, in the goods stored in the Warehouse. Contractor shall, at any time as MARS may request, execute and deliver, or assist in executing and delivering, any statement which shows or indicates that Contractor has no right, title or interest in said goods. Contractor shall, at MARS' request and expense, assist MARS in protecting and defending the right, title or interest of MARS' and its affiliates in and to the goods against

any and all persons asserting a claim of any kind against or through Contractor. Contractor shall, upon demand of MARS, prepare to ship to any location and in the manner MARS so requests, all or any portion of the goods stored in the Warehouse.

## 9.   *INBOUND SHIPMENTS; TRANSFER OF GOODS; REMOVAL OF GOODS*

Contractor shall strictly follow the instructions of MARS with regard to effectuating, documenting and handling inbound shipments, and the transfer and removal of goods (including contaminated goods) as are set forth in the Quality Manual.

## 10.   *RIGHT OF REFUSAL*

Contractor may refuse to accept any MARS goods which the Contractor, acting responsibly and reasonably determines that, due to infestation visible during the inspection process mutually agreed upon by the parties, contamination or damage, might cause infestation, contamination or damage to other MARS goods stored in the Warehouse, and shall immediately notify MARS of such refusal. Contractor shall have no liability for any demurrage, detention, transportation or other charges by virtue of such refusal. Contractor shall observe the instructions of MARS with respect to the refusal or disposition of such goods as set forth in the Quality Manual or otherwise instructed by MARS.

## 11.   *BOOKS, RECORDS, INFORMATION AND DATA*

Contractor shall maintain complete and accurate books and records relating to the Management Services and all costs and expenses in connection therewith, in a form prescribed by MARS and, if no form is so prescribed, in accordance with generally accepted accounting practices. All such books and records, including without limitation, computer records, will be available at all times for MARS' inspection, auditing and copying.

Contractor acknowledges that all computer hardware and software used by it in the performance of the Management Services, is accessible by MARS in accordance with defined parameters as mutually agreed between the parties. Contractor further acknowledges that all data and information relating to the Management Services, the goods of MARS or the Warehouse, wherever and however prepared and/or maintained by or on behalf of the Contractor, or received from MARS, whether handwritten, typewritten or electronically entered or in any other form whatsoever, shall be and remain the exclusive property of MARS and MARS shall have the right to receive any and all such data and information from the Contractor immediately upon written notice. Notwithstanding the above, in the event of termination of the business relationship for any reason, Contractor may retain copies of all applicable business records.

MARS shall be responsible for installation and maintenance of the Warehouse Management System and training of one (1) Functional User of Contractor on use of the system(s) and related equipment. In order to assure accountability and control for any inventory transactions, MARS will supply documentation history to validate any discrepancies which need to be reconciled. Should adjustments be required, system entries are only able to be changed via a separate adjustment entry. MARS agrees not to make any inventory adjustments without Contractor's prior written consent. If such adjustments are made without prior written notification and Contractor identifies an inventory discrepancy, Contractor shall have ninety (90) days to reconcile such inventory discrepancy and MARS shall cooperate with Contractor in any such reconciliation. If Contractor can reasonably demonstrate that any unaccounted for

DEF000008

inventory was attributable to any MARS adjustments, Contractor shall not be responsible for the associated loss.

## 12.   *ON-SITE INSPECTION*

MARS or any of its agents, employees or representatives reserve the right to enter the Warehouse at any time (with 24 hours advance notice to Contractor to the extent feasible) for the purpose of examining and counting all or any of the goods stored there and conducting any such tests as are necessary, in the judgment of MARS, to ensure that the Warehouse is in clean and sanitary condition, is free of any contamination and complies in all respects with any applicable law, regulation or standard, and for any other purpose whatsoever, and Contractor agrees to cooperate with MARS in any such on-site inspection and testing. MARS reserves the right to maintain a secure office within the Warehouse limited to designated MARS personnel and such personnel shall have  the right to enter any area of the Warehouse operation at any time during Contractor's normal business hours.

## 13.   *TERMINATION*

A.      Immediate Termination.  MARS may terminate this Agreement immediately by notice in writing if (i) Contractor breaches any of its obligations hereunder, and such breach (a) is not in dispute, (b) is attributable to the willful misconduct or negligence of the Contractor, and (c) results in any interruption of the continuous and efficient operation of the Warehouse for more than eight (8) consecutive business hours; or (ii) if Contractor abandons the Warehouse for more than eight (8) consecutive hours during times which the Warehouse is required to be open and operating as set forth in Section 4 of this Agreement;  or (iii) there is an emergency (defined below).

B.      Termination After Right to Cure.  Either party has the right to terminate this Agreement if the other party is in default of any obligation, warranty, claim or representation hereunder, which default is incapable of cure, or which, being capable of cure, has not been cured within ten (10) business days after receipt of notice of such default, or such additional cure period as the non-defaulting party may authorize, provided, however, that if the noticed default shall not be an "emergency" ("emergency" being deemed to mean that said default, if not attended to immediately, might (i) result in injury or damage to persons or property, or (ii) interfere with the conduct of MARS' business in or upon the premises or the Warehouse, or (iii) damage MARS' inventory stored in the Warehouse such that the quality of said inventory would be affected as determined by MARS according to its own quality standards) and the defaulting party has, within ten (10) days, promptly commenced efforts to cure and is continuously and diligently pursuing said cure to completion, the defaulting party's failure to complete the cure within ten (10) days shall not constitute a default hereunder. The aforementioned written notice of default shall state with particularity the circumstances of the specific default or defaults alleged and the steps necessary to cure such default.  In the event a default is not cured within the defined cure period, or is otherwise deemed incapable of cure, the non-defaulting party has the right to terminate this Agreement by providing written notice to the defaulting party.

C.      Termination at Will.  MARS may terminate this Agreement, in its sole discretion, without cause or reason and without being considered in default of any provision of this Agreement, at any time by giving one hundred and twenty (120) days' written notice thereof. The effective date of said termination shall be the one hundred and twenty-first (121st) calendar day after the date of delivery of the termination notice.  In the event of such termination and within ninety (90) days after the receipt from Contractor of all supporting documentation subject to Section 13D herein below, MARS shall pay to Contractor any

DEF000009

Allowable Operating Expenses in the event that Contractor has paid said expenses on MARS' behalf and is entitled to reimbursement under this Agreement subject to Section 4B.

      D.     <u>Final Accounting</u>. Regardless of the reason or cause, if any, for termination of this Agreement, or upon expiration of this Agreement, Contractor shall submit to MARS invoices for all outstanding Allowable Operating Expenses (with all supporting documentation) no later than sixty (60) calendar days after such termination or expiration, otherwise MARS shall have no liability or obligation to pay or reimburse such Allowable Operating Expenses. Within ninety (90) days after the receipt from Contractor of such invoices, and all supporting documentation, MARS shall pay the Allowable Operating Expenses to which Contractor in entitled under Section 4 and any other mutually agreed upon costs.

      E.     <u>Acts of Insolvency</u>. Either party may terminate this Agreement by written notice to the other, and may regard the other party as in default of this Agreement, if the other party becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or becomes subject to any proceeding under any bankruptcy or insolvency law (provided there is no dismissal or discharge within thirty (30) days), whether domestic or foreign, or has wound up or liquidated, voluntarily or otherwise. In the event that any of the above events occur, that party so affected shall immediately notify the other party of the occurrence.

      F.     <u>Rights and Obligations of the Parties on Termination</u>. Should Mars terminate this Agreement for any reason provided herein or Contractor terminates this Agreement under aforementioned Sections13A, 13 B or 13E , MARS shall pay to Contractor any unpaid Management Fee due and payable up to the date of termination, which Fee, in the case of a partial period, shall be pro-rated on a monthly basis. Upon termination, Contractor shall peacefully vacate the Warehouse, and forthwith return to MARS any records, documents, papers, materials, disks, computer programs, information, data, and any other property of MARS then in its possession or control which Contractor may have received from, or has access to through, MARS or which Contractor may have acquired or compiled for the purposes of performing its obligations under this Agreement. Contractor may retain a copy of any documentation that is necessary for audit or regulatory compliance purposes. . Contractor shall immediately return to MARS any advance payments it shall have received for Management Services which, as a result of the termination, will not be performed or have been rejected by MARS. Upon vacating the Warehouse, Contractor shall leave said premises in as good condition as when it first assumed its responsibilities hereunder, ordinary wear and tear excepted subject to Section 6.

      The Contractor shall not remove any equipment, fixtures, tools, records, documents, papers, disks, computer programs, information, data, with the exception of Contractor's business records, or any other property at or used in connection with the operation of the Warehouse or terminate any services relating to the Warehouse, whether they are the subject matter of any Operating Agreements (as defined in Section 13G hereunder) or otherwise, without the prior written consent of MARS.

      Until the termination of this Agreement after any period of notice or time to cure any default, if any, or the Expiration Date of the initial Term or Extension Term, as the case may be, the Contractor shall provide its full, complete and good faith cooperation to MARS in the provision of the Management Services and the turnover thereof to MARS or its designee, as MARS shall direct. Notwithstanding the foregoing, in the event that MARS exercises its right of termination under Section 13C of this Agreement, MARS may in its sole discretion request that the Contractor cease providing some or all of the Management Services at any time or times during the one hundred and twenty (120) day period of notice, whereupon the Contractor shall cease to provide such Management Services on the date so requested by MARS; provided however Contractor shall be compensated in full as if it were performing such services through the entire one hundred and twenty (120) day period. Nothing in this provision sentence shall prejudice the right of the Contractor to receive the monies which it would have been otherwise entitled to

DEF000010

receive under Section 13C nor relieve the Contractor from its obligations under Sections 13D, 13F, 13G, 13H, and 13I of this Agreement.

      G.    <u>Operating Agreements</u>. In performing its obligations under this Agreement, Contractor has separately entered into personal property leases, agreements for the supply of goods, agreements for the supply of services and other such agreements with third parties approved in writing by MARS; or has assumed such leases and agreements with third parties from Contractor's predecessor (collectively the "Operating Agreements"). Upon the expiration or termination of this Agreement, MARS or its designee shall : (i) request that Contractor terminate any one or all of the Operating Agreements, that for any such agreement which includes a provision requiring payment of a penalty upon early termination or termination prior to the defined lease term or fully amortized term, MARS shall pay such penalty only if Contractor notified MARS and obtained its agreement in writing to the inclusion of such a provision in the agreement prior to the time the agreement was executed; or (ii) have any one or all of the Operating Agreements assigned to MARS or its designee. Any Operating Agreement which by its terms cannot be terminated early shall be assumed by or assigned to MARS. Upon the effective date of termination or expiration of this Agreement, MARS shall assume the obligation of Contractor arising under any of the Operating Agreements which cannot be terminated. Contractor shall remain fully liable for all obligations under the Operating Agreements up until the date of termination or expiration of this agreement whichever occurs first. If any required approval by MARS hereunder is given verbally and not in writing, the burden shall be upon Contractor to prove that such approval was given. In addition, MARS shall reimburse Contractor in full for all amortized costs for which there is an outstanding balance within ninety (90) days of termination of the business relationship.

      H.    <u>Operating Assets</u>. Attached to this Agreement as <u>Appendix C</u> is a list of all assets including equipment, fixtures, tools, and the like, whether owned by Contractor, by MARS or by third parties and used in performing Contractor's obligations under this Agreement, and including assets the costs for which (including acquisition, maintenance and financing costs) are reimbursed by MARS as an Allowable Operating Expense (collectively, the "Operating Assets"). Upon the expiration or termination of this Agreement , the parties shall agree to mutually proceed with one of the following options as applicable : (i) purchase (on commercially reasonable terms including the payment on installment) any or all of the Operating Assets owned by Contractor at the greater of their then-current fair market value based on the remaining useful life of the asset, which value shall be calculated using a straight-line amortization method over the useful life of the asset after deducting any portion of the Contractor's original purchase price that has been paid or reimbursed by MARS or the outstanding balance of amortized payments to be paid by Mars;or (ii) lease any or all of the Operating Assets from the Contractor for the remainder of the defined lease term from the date of termination or expiration of this Agreement, and assume any remaining lease obligations on such terms as shall be reasonably acceptable to Contractor, and at a rental rate which shall be equal to the Allowable Operating Expense in the then-current Final Operating Budget for the acquisition, maintenance and financing costs of such Operating Assets; or (iii) Contractor may elect to keep the equipment as mutually agreed by the parties. Contractor shall not alter, exchange, sell, dispose of, or remove any Operating Assets from the Warehouse without the prior written consent of MARS provided Contractor is compensated for any costs that would normally be incurred by Contractor associated with such Operation Assets. Contractor shall provide copies of any or all agreements related to the Operating Assets promptly upon MARS' request therefore. In the event that MARS or its designee assumes the leases or buys the equipment, Contractor will be indemnified for any liability for loss, damages or injuries arising from the use of such materials, tools or equipment from and after the date that MARS or its designee assumes the leases or buys the equipment. The foregoing shall not be interpreted to require MARS to indemnify Contractor in the event the Contractor is liable for any loss, damages or injury arising from its proven negligence or use prior to the date MARS or its designee acquires the equipment.

DEF000011

I.     Employees of Contractor.  In the event this Agreement is terminated with or without cause or in the event that this Agreement expires at the end of the Term, Contractor shall be and remain liable and responsible for all employees employed at or in connection with the Warehouse, whether or not such employees are retained by Contractor or terminated from their employment, and all employee costs, expenses and obligations arising as a consequence of the termination or expiration of this Agreement, including all wages, salaries, severance pay, termination pay, vacation pay, benefits and other entitlements which may be incurred or which may arise as a consequence of the termination or expiration of this Agreement.  To the extent any of the foregoing costs may have been approved and reimbursed by MARS as an Allowable Operating Expense prior to such termination, MARS shall not reimburse Contractor for any of the foregoing costs or expenses if termination is for cause unless such costs and expenses are for work that has actually been performed.  Contractor shall indemnify and hold MARS harmless from any claim, demand, complaint, action, cause of action, damages, costs, expenses or any other liability or obligation to its employees in the event of termination or expiration of this Agreement.

Without detracting from or diminishing the obligations, responsibilities and liabilities of the Contractor with respect to its employees under this Agreement, in the event that this Agreement is terminated with or without cause, or in the event that this Agreement expires at the end of the Term, MARS or its designee shall have the right, but not the obligation, at any time whether before or after such termination or expiration to offer to any such employees of the Contractor, as MARS may deem desirable or necessary in order to secure the continuous and uninterrupted operation of the Warehouse, employment with MARS or its designee after the date of termination or expiration, and the Contractor hereby consents thereto.  MARS shall provide Contractor with written notice of any employees MARS may desire to hire. In such event, the Contractor shall remain liable and responsible for all employees who are not extended offers of employment by MARS or a designee of MARS.  In the case of employees of the Contractor who are extended offers of employment by MARS or its designee, MARS shall notify Contractor of those employees and at MARS' election the Contractor shall be liable for and shall pay all wages, salaries, vacation pay, benefits and other entitlements ("Employee Obligations") accruing up to the date prior to the date of their employment by MARS or any of its designee (subject to the Contractor's right to receive reimbursement thereof from MARS under this Agreement), and MARS or its designee  shall assume the Employee Obligations arising from and after the date of such employment.

## 14.     *INDEMNIFICATION*

A.     By Contractor.  Contractor shall indemnify and hold harmless MARS, its parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, agents, successors, and assigns (hereinafter, the "Indemnified Party") against claims, losses, damages, expenses, fees (including, without limitation, fines, penalties, court costs, and attorneys' fees) and liabilities  (including strict, statutory and regulatory liability) (collectively, "Claims") regardless of the form of action brought against any Indemnified Party, arising out of the NEGLIGENCE or WILLFUL MISCONDUCT of Contractor, other than any Claims losses, damages, expenses or liabilities due to the negligence or willful misconduct of any Indemnified Party, arising from or in connection with, but not limited to, (i) Claims for bodily injury or death, personal injury, advertising injury or property damage (except for those damages covered under Section 6  herein) (including, but not limited to, theft) arising from the negligence of Contractor; including any incident with forklifts leased by Mars (ii) Claims for infringement of any intellectual property rights (including patents, trade secrets, copyright and trademarks), or for misuse of proprietary information related to any goods or services sold, provided or used by Contractor; (iii) Claims for any violation or threatened violation by Contractor of any law, rule or regulation of any governmental agency or authority (including, but not limited to, any environmental law related to contamination by, or the release or threat of release of, any hazardous or toxic substance, waste or pollutant into any environmental medium) but excluding any violation of government regulation when such violation is caused by

DEF000012

Contractor's compliance with MARS' North American Warehouse Quality Assurance Manual and/or compliance with guidance documentation and/or SOPs as provided by MARS ; (iv) Claims arising out of Contractor's acts, omissions or failure to perform any obligation with respect to Contractor's employees or any subcontractors; (v) Claims for Contractor's breach of any warranty, representation, covenant or other provision of this Agreement; (vi) Claims arising under the Operating Agreements prior to the termination or expiration of this Agreement except as otherwise addressed herein; and (vii) Claims for any other negligent act or negligent omission of Contractor in connection with its performance of this Agreement except as otherwise addressed herein. All references to "Contractor" in paragraphs (i) through (vii) of this Section shall be deemed to include Contractor's shareholder's, officers, directors, employees, agents, invitees contractors, subcontractors or any person or entity acting under Contractor's direction or control. Contractor expressly agrees to waive any immunity or exclusivity of any labor or workers' compensation or other similar statute. Contractor's obligation to indemnify any Indemnified Party will survive the expiration or termination of this Agreement by either party for any reason.

Each party shall promptly notify the other party of the existence of any Claim, demand or other action giving rise to a claim for indemnification under this Section. Promptly upon the request of MARS, Contractor shall conduct the defense of any action against the Indemnified Party arising under this Agreement unless indemnification falls under the scope of Section 14 B below, including the employment of counsel reasonably acceptable to MARS and the payment of all expenses of such defense. MARS shall at all times have the right to participate in such defense using its own counsel and if Contractor fails to assume the defense as required hereunder, then MARS shall have the absolute right to control the defense of such Claims. Unless otherwise expressly so provided, this indemnity shall not be limited by any insurance coverage obtained or required to be obtained by Contractor or any limits of liability or limits on the type of damages with respect thereto.

B.      By MARS.      MARS shall indemnify and hold harmless Contractor, its corporate affiliates, and its owners shareholders, officers, directors, employees, agents successors and assigns (hereinafter, "Contractor Indemnified Party") from and against any and all claims, losses, damages, expenses, fees (including, without limitation, all fines, penalties, court costs and attorneys' fees) and liabilities (including strict statutory, and regulatory liabilities) regardless of the form of action brought against any such Contractor Indemnified Party, other than any claims, losses, damages, expenses or liabilities due to the negligence or willful misconduct of any Contractor Indemnified Party, arising from claims for bodily injury or death, personal injury or property damage resulting from the  negligence of MARS, its agents or employees and/or any violation of government regulation  when such violation is caused by Contractor's compliance with MARS' North American Warehouse Quality Assurance Manual and/or compliance with guidance documentation and/or SOPs as provided by MARS.. This indemnification shall survive the expiration or termination of this Agreement.

## 15.      *TAXES*

Notwithstanding that certain of Contractor's taxes defined in this Agreement and any Appendix hereto may be reimbursable by MARS (except that nothing in this Agreement shall be deemed or construed to obligate MARS to pay, or reimburse Contractor for, taxes imposed on Contractor's net income), Contractor shall be responsible for the payment of all taxes imposed upon it, in connection with or as a result of this Agreement, to the appropriate taxing authority. In the event that Contractor is able to receive a refund or rebate of any taxes paid by it and reimbursed by MARS, Contractor shall immediately repay to MARS the amount of such refund or rebate. Contractor acknowledges that, inasmuch as its relationship to MARS is that of an independent contractor, Contractor is responsible for paying all Social Security taxes, FICA, payroll taxes or other taxes rendered or assessed by the Government of the United Sates or any state or local taxing unit on Contractor or Contractor's personnel. It is further understood and agreed that MARS shall not be responsible for withholding any taxes with respect to Contractor's

DEF000013

employees, and shall retain the right to require Contractor to present evidence of its compliance with the terms of this Section.

**16.    *CONFIDENTIAL AND PROPRIETARY INFORMATION; PUBLICITY***

A.    <u>Proprietary Information</u>. Each party acknowledges and agrees that any and all information emanating from the other's business (MARS' business being deemed to include the business of Mars, Incorporated, and any of Mars, Incorporated's divisions or subsidiaries), in any form including any compilations of otherwise public information is "Confidential and Proprietary Information," and each party agrees that it will not, during or after the initial Term or any Extension Term of this Agreement, permit the duplication, use or disclosure of any such Confidential and Proprietary Information to any person (other than its own employees, agents or representatives who must have such information for the performance of its or their obligations hereunder), unless such duplication, use or disclosure of such Confidential and Proprietary Information is specifically authorized in advance by the other party in writing. Each party shall be responsible for any unauthorized duplication, use or disclosure made by any of its employees, servants or agents and shall take reasonable precautions to prevent such duplication, use or disclosures. For the purposes of this subsection, the term "Confidential and Proprietary Information" is not meant to include any information which, at the time of disclosure, is generally known by the public and any competitors of MARS; information disclosed to the other party by third parties having a right to do so and who have not imposed upon the recipient thereof obligations of confidentiality, or information which is known to the other party prior to disclosure. Contractor shall promptly notify MARS of any requirements of, or requests from, any governmental authority or any request in the context of any legal proceeding to disclose any Confidential and Proprietary Information relating to MARS, and Contractor shall not disclose such information without first notifying MARS so that MARS may contest such disclosure and shall cooperate with MARS in resisting such disclosure, to the fullest extent permitted by law.

B.    <u>Publicity; Trademarks. etc.</u>  Contractor shall not use the name, trademarks or trade names (whether registered or not) of Mars, Incorporated or of any of its divisions or subsidiaries in publicity releases or advertising, or in any other manner, including customer lists, without the prior written consent of Mars, Incorporated.

**17.    *ASSIGNMENT***

Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's written consent, except that (i) MARS may assign this Agreement without the consent of the Contractor to any corporate affiliate of MARS provided that MARS remains the guarantor of, and is fully liable for, the performance of all of its obligations under this Agreement, and (ii) Contractor may assign its right to receive payments under this Agreement to such third parties as Contractor may desire without consent of MARS, provided that Contractor gives written notice (including evidence of such assignment) to MARS thirty (30) days in advance of any payment so assigned. Any subcontract made by Contractor with the consent of MARS as aforesaid shall incorporate by reference all terms of this Agreement.

**18.    *STATUS AS INDEPENDENT CONTRACTOR***

It is agreed and understood by both parties that the relationship of Contractor to MARS is one of an independent contractor, that Contractor shall not represent to anyone in any manner, express or implied, that Contractor is an employee, or that Contractor's personnel are employees, of MARS, and that

DEF000014

nothing in this Agreement shall be construed to confer on Contractor any authority, express or implied, to bind or commit MARS to any third party in any way whatsoever. As an independent contractor, neither Contractor nor Contractor's personnel is entitled to the benefits provided by MARS to its employees, including, but not limited to, group and health insurance, deferred compensation and retirement benefits. As an independent contractor, Contractor has sole authority with respect to its employment policies, including, but not limited to, promotions, discipline, relocation, or termination, and such policies are not subject to agreement or consent on the part of MARS. Nothing in this Agreement shall be construed to suggest that the parties hereto are general partners, joint venturers or joint employers.

## 19. *INSURANCE*

A.  Required Coverage. Contractor is responsible for obtaining and maintaining in full force and effect commercial general liability, workers' compensation, employers' liability, business automobile liability, warehouse legal liability and umbrella liability insurance pursuant to the minimum limits and other requirements contained herein or reasonably requested by MARS. Coverage shall be maintained insuring Contractor and MARS, against liabilities whether or not asserted by or on behalf of Contractor's employees, invitees, officers, owners, directors, contractors, subcontractors or agents. Contractor shall comply with all state and local insurance statutes and regulations. Contractor's commercial general liability and umbrella insurance policies shall include contractual liability, with limits of not less than the amounts specified below, and shall include all defense costs, including, but not limited to, attorneys' fees, court costs, and other similar costs and expenses. It is understood and agreed that any insurance limits shall not be construed as a limitation on Contractor's liability except as specifically addressed in Section 19 D. The policies shall provide coverage for any liability Contractor (including its employees, agents, invitees, contractors or subcontractors) may have for bodily injury or death, personal and advertising injury, or property damage. MARS, including its divisions, subsidiaries, parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, and agents shall be included as "additional insureds" under all insurance policies provided by Contractor (except workers' compensation and warehouse legal liability and umbrella coverage (which follows form). MARS shall not be deemed to fall within the definition of "an Insured" for purposes of any damage, loss, bodily injury or death to employee exclusions that may exist within Contractor's policies, and Contractor shall provide an endorsement to that effect. All such policies shall be primary to, and not contributory with, any coverage which may otherwise be available to MARS. Each such policy shall contain a "separation of insureds" clause which shall have the effect of insuring each person, firm or corporation insured hereunder in the same manner and to the same extent as if a separate policy has been issued to each.

All insurance required hereunder shall be obtained through an insurance company with a minimum rating of A-VII or better as evaluated by the most current A.M. Best rating guide. If the insurance company has a rating less than A-VII, Contractor must receive specific written approval from MARS prior to proceeding.

Not later than ten (10) days prior to the expiration of, or the effective date of any material change in, any policy or policies hereunder, Contractor shall deliver (or cause the insurance company to deliver) to MARS written notice if the policy or policies will be cancelled or the coverage materially changed. As evidence of renewal, Contractor shall, not later than ten (10) days prior to expiration, either (i) deliver (or cause the insurance company to deliver) to MARS a new certificate of insurance, together with evidence of payment of the premiums for the renewal period, or (ii) if Contractor is unable, after a good faith effort, to deliver any such policy or certificate by the specified date, Contractor shall notify MARS in writing of the reasons why such insurance has not been renewed, shall advise MARS of the anticipated date of such renewal and shall deliver to MARS copies of any such policy or certificate, and evidence of payment, promptly upon their becoming available. Failure to deliver such notices, policies or certificates, as the

DEF000015

case may be, or to pay the premiums on said policies when they become due, shall be deemed to be a default by Contractor under Section 13 hereof.

If at any time Contractor fails to obtain insurance (or provide proof of insurance) in accordance with this Agreement, or otherwise required by MARS, MARS may, but it not required to, obtain the coverage specified in this Agreement and charge all associated premiums and costs to Contractor. Contractor shall reimburse MARS the cost thereof within fifteen (15) days of receipt of notice from MARS or MARS may deduct the cost thereof from the Management Fee.

Insurance Specifications

Contractor agrees to maintain the following <u>MINIMUM</u> limits of insurance:

1. Workers' Compensation and Employers' Liability:
   Limits:
   | | | |
   |---|---|---|
   | a. | Workers' Compensation: | Statutory Limits |
   | b. | Employers' Liability: | $1,000,000 |

Contractor may self-insure for Worker's Compensation in any jurisdiction where it is qualified to do so. In Texas, Contractor may non-subscribe for Worker's Compensation and provide alternate coverages. Contractor shall provide proof of a commercially reasonable non-subscriber plan if Contractor chooses Non-subscription.

2. Commercial General Liability: (Commercial General Liability Form ISO 1998 or later, including Contractual Liability and Products and Completed Operations, on an occurrence form for bodily injury and personal injury or property damage:

   Limits:
   | | | |
   |---|---|---|
   | a. | Bodily Injury & Property Damage | $1,000,000/occurrence |
   | b. | Personal Injury & Advertising Injury | $1,000,000/occurrence |
   | c. | Products/Completed Operations Aggregate | $1,000,000 |
   | d. | General Aggregate per location: | $2,000,000 |

3. Automobile Liability: Liability coverage for any auto whether owned, rented, hired, borrowed or non-owned by the Contractor:

   Limits:
   | | | |
   |---|---|---|
   | a. | Combined Single Limit | $1,000,000/occurrence |
   | b. | Personal Injury Protection (in applicable states) | Statutory |

4. Umbrella Liability: Liability coverage attaching excess of Commercial General Liability, Automobile Liability, and Employers' Liability policies.

   Limits:
   | | | |
   |---|---|---|
   | a. | Per Claim: | $10,000,000 |

Contractor shall cause any subcontractor to add Contractor and MARS, its divisions, subsidiaries, parent and corporate affiliates, and its owners, shareholders, officers, directors, employees, and agents, as "additional insureds" and endorsed as such under the Umbrella Liability, Commercial General Liability and Automobile Liability policies. Contractor shall cause any subcontractors to issue certificates of insurance indicating compliance with the insurance terms and conditions above, and shall be responsible for ensuring that subcontractors (i) comply with the requirements set forth above, and (ii) maintain such coverage with respect to their work.

DEF000016

If an affiliate of Contractor has entered into an Agreement for Lease of Warehouse leasing to MARS, or an affiliate of MARS, the Warehouse space, the insurance requirements of the Lease with respect to commercial general liability and automobile liability insurance may be satisfied by Contractor's causing the policy or policies it obtains pursuant to this Section 19A to name the landlord under the aforementioned Lease as a named insured in connection with said insurance.

B.    Insurance on Building Contents. MARS shall, at its sole cost and expense, insure and keep insured any property in, on or about the Warehouse in which MARS has an insurable interest, including (but not limited to) MARS' inventory, furniture, fixtures, equipment and other of MARS' property.

C.    Product Liability Insurance. MARS shall maintain product liability insurance and shall indemnify and hold Contractor harmless against all liability to third parties for injury resulting from consumption of a product manufactured by MARS, including any of its wholly-owned subsidiaries or divisions, except to the extent the injury resulted from the  negligence of contractors or Contractor's employees agents, contractors and subcontractors.

D.    Warehouseman's Legal Liability Insurance.  Prior to occupancy of the Warehouse by MARS, the Contractor shall obtain Warehouseman's Legal Liability Insurance covering against risk of loss of inventory and property belonging to Mars, Incorporated, or any of its wholly-owned subsidiaries and divisions, resulting from the negligence of Contractor, which insurance shall be in the amount of $25 (twenty-five) million.  Damaged inventory and product insured hereunder will be valued at Mars, Incorporated's actual replacement cost  (defined as the cost of the raw materials and packaging material at actual cost, which excludes profit and any applicable taxes) for payment of claims, which claims shall be paid without regard to any deductible.    The Contractor shall obtain such insurance and shall pay the premiums for such insurance coverage.  Annually, MARS shall reimburse, as an Allowable Operating Expense pursuant to Section 5 of this Agreement, premiums for the required coverage, Contractor shall promptly deliver to MARS the policy or certificate of insurance, as MARS may request, together with evidence of payment of the premiums.  Contractor's failure to deliver said policy or certificate or to pay the premiums on said policies when due shall be deemed a default by Contractor under Section 13 hereof. Such policy shall respond as primary coverage to any other insurance which may otherwise be available to MARS.
Contractor's liability for loss or injury to Goods shall be limited to loss or damage attributable to Contractor negligence subject to the limits of the warehouse legal liability insurance as identified herein, $25 million per occurrence based on actual replacement cost excluding profit, unless such limitation is increased by written request by MARS with acknowledgement by Contractor. Notwithstanding the above, in the event of Contractor liability MARS agrees to a shrinkage/damage allowance each calendar year during the term of the Agreement of .005% based on total cost of Goods variance divided by total cost of Goods received on an annual basis for which, in the case of loss or damage to GOODS or mysterious disappearance Contractor will not be liable not to exceed one hundred fifty thousand dollars ($ 150,000) on an annual basis. Liability in excess of the allowance shall be subject to $25 million per occurrence limitation identified above.

E.    Notice of Loss or Damage to Goods. Contractor agrees to notify MARS promptly in writing of any known loss or damage, however caused, to goods stored or handled under the terms of this Agreement.

F.    Reimbursement of Insurance Premiums.  MARS shall reimburse Contractor for the cost of the premiums for the coverage required to be obtained by Contractor, at the minimum limits required,

DEF000017

under this Section 19, provided said coverage satisfies all of the requirements of this Section. MARS shall not pay for insurance in excess of the minimum limits specified herein.

## 20. *MARS' INSTRUCTIONS*

Contractor acknowledges that MARS may, in its sole discretion, assign identified MARS' employees (whose salaries, fringe benefits and employer tax obligations shall be borne by MARS) to the Warehouse. Contractor shall not be responsible for obeying verbal instructions of MARS' employees which contradict written instructions. Further, Contractor shall ensure that its personnel assigned to the Warehouse shall attend, at MARS' request and expense, all training sessions held by MARS or its designee.

## 21. *DEMURRAGE AND OTHER CHARGES FOR DELAY*

MARS shall be liable for the payment of any unpaid transportation charges in connection with the in-bound shipment of goods to the Warehouse, including undercharges, demurrage, detention, or any other charge incurred in connection with goods shipped, and it shall be the responsibility of MARS to plan the arrival of its shipments to avoid unreasonable bunching or other unloading problems. Contractor shall be liable for the payment of transportation charges in the event that such charges result from Contractor's failure to exercise reasonable care and judgment, including reasonable planning to ensure that unloading services and facilities are available upon the arrival of MARS' goods provided shipments are reasonably consistent with MARS shipping projection/forecast. It shall be the responsibility of Contractor to communicate immediately by telephone to the carrier upon the occurrence of any demurrage in excess of forty dollars ($40.00), and to maintain accurate records and documentation of the facts relating to such demurrage, detention or delays, including any actions taken by Contractor to alleviate such demurrage, detention or delays in order to assist MARS in processing any objection to carrier's imposition of such charges. If detention occurs for which Contractor is liable, payment of such detention shall be made by the Contractor to MARS unless otherwise directed by MARS.

## 22. *FORCE MAJEURE*

A.   Force Majeure Defined. Neither Contractor nor MARS shall be liable to the other for any failure to perform pursuant to the terms and conditions of this Agreement to the extent such performance was prevented by an event of Force Majeure. "Force Majeure" as used in this Agreement means any event which is unforeseeable and beyond the reasonable control of the party whose performance is affected and which, with the exercise of due care, said party could not reasonably have been expected to avoid, including, but not limited to, acts of God, explosions or fires, floods, hurricanes, tornadoes, lightning, earthquakes, drought, epidemics, blight, famine, quarantine, blockade, acts or inactions of governmental authorities, insurrection or civil strife, rebellion, or sabotage.

To be excused from performance pursuant to this provision, however, the party whose performance is affected must (i) immediately give notice to the other party, including full details of the event of Force Majeure and its creation of an inability to perform, and (ii) exercise immediate and uninterrupted due diligence to remove its inability to perform. The burden of proof to establish the existence of an event of Force Majeure and any resulting inability to perform on its part shall be on the party seeking an excuse from performance due to Force Majeure. Upon receipt of the aforementioned notice, payment shall be suspended with respect to any Management Services not being performed. If the period of non-performance exceeds thirty (30) days from the event of Force Majeure, the party whose ability to perform has not been so affected, may by giving written notice, terminate this Agreement. If an

DEF000018

event of Force Majeure asserted by Contractor causes the cessation of operations of the Warehouse, MARS shall be entitled to undertake all reasonable actions to overcome the effect of the Force Majeure and to minimize its impact on MARS' operations.

B. Exclusions from Definition of Force Majeure. Notwithstanding anything in this Agreement to the contrary, "Force Majeure" shall not mean:

(i) Unavailability of equipment, repairs or spare parts for the Warehouse, except to the extent caused by a qualifying event of Force Majeure;

(ii) Any event to the extent caused by the negligence, willful misconduct or breach of this Agreement by the party claiming Force Majeure;

(iii) Any breakdown or failure of any mechanical or other component of the Warehouse which fully or partially curtails operations to the extent caused by the design or construction of the component or the failure to properly operate and maintain the component, irrespective of whether the failure is attributable to the negligence or fault of the party asserting Force Majeure;

(iv) Failure to perform by any subcontractor, vendor, manufacturer, supplier, provider, or other third person except to the extent the failure is also caused by a qualifying event of Force Majeure as defined in this Agreement. In this respect, the compliance of any person contracting with the Contractor or MARS shall be deemed to be within the control of Contractor or MARS, as applicable;

(v) Work stoppages by Contractor's employees.

## 23. *MISCELLANEOUS*

A. Headings. The section headings contained herein are for convenience of reference only and shall not control the interpretation of any term or condition hereto.

B. Severability. Any invalidity, in whole or in part, of any provision of this Agreement shall not affect the validity of any other of its provisions.

C. Cumulation of Remedies. All remedies available to either party for breach of this Agreement are cumulative and may be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed an election of such remedy to the exclusion of other remedies.

D. Notices. Any notices, consents, waivers, demands, approvals, statements, or other communications, which this Agreement requires or permits either party to give the other shall be given in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered by nationally recognized overnight delivery service to the parties at their respective addresses below. Either party may change its mailing address at any time by giving notice of such change to the other party at least ten (10) days prior to the effective date of such change. All notices shall be deemed given (i) if by hand, on the date of receipted delivery or refusal to accept delivery, or the date delivery is first attempted but cannot be made due to a change in the address of which no notice was given or (ii) if by mail, on the date actually delivered, or (iii) if by overnight delivery service, on the next business day after delivery to a nationally recognized overnight delivery service.

To MARS:    Attention:    Commercial Manager - Warehouse Services
800 High Street
Hackettstown, NJ 07840
(908) 798-1000
steven.y.sheldon@effem.com

DEF000019

                              With a copy (which shall not constitute notice) to
                              Regional Distribution Manager
                              2019 North Oak Park Avenue
                              Chicago, IL 60707
                              (773) 892-7735
                              robert.coffey@effem.com

To MARS' Counsel:            Edgar Pew
                              Associate General Counsel-North America
                              800 High Street
                              Hackettstown, NJ 07840
                              (908) 979-5863
                              Edgar.pew@effem.com


To Contractor:               VP of Operations  - MARS Account
                              Kenco Logistic Services, LLC
                              2001 Riverside Drive
                              Chattanooga, TN   37406
                              (423) 290-3749
                              paula.hise@kencogroup.com


To KENCO's  Counsel:         Corporate Counsel
                              Kenco
                              2001 Riverside Drive
                              Chattanooga, TN   37406
                              (423) 643-3215
                              ann.christopher@kencogroup.com


E.      Waiver.  Any waiver, express or implied, or any breach of any term, covenant or condition of this Agreement shall not be, or be construed to be, a waiver of any subsequent breach of any term, covenant or condition hereof on either the part of Contractor or MARS.

F.      Nondiscrimination.  Federal Contractors Requirements.  To the extent they are applicable, this document incorporates the following clauses by reference:  the Equal Opportunity clause relating to equal employment opportunity for all persons without regard to race, color, religion, sex or national origin, 41 C.F.R. §60-1.4; the Affirmative Action clause regarding disabled veterans and veterans of the Vietnam-era, 41 C.F.R. §60-250.5; the Affirmative Action clause, regarding obligations to disabled veterans, recently separated veterans, other protected veterans and armed forces service medal veterans, 41 C.F.R. §60-300.5, and the Affirmative Action clause regarding obligations to individuals with disabilities, 41 C.F.R. §60-741.5.  Contractor certifies that it complies with the non-discrimination and affirmative action requirements of these clauses, and all applicable laws, regulations, amendments and orders; requires subcontractors, if any, to do the same; and warrants that all Products and/or Services provided hereunder are in full compliance with these regulations.

DEF000020

Furthermore, to the extent applicable, during the term of this Agreement, Contractor agrees to post the notice and abide by the provisions set forth at 29 C.F.R. Part 471 Appendix A and incorporated herein by reference.

       G.    <u>Substance Abuse</u>.  Contractor warrants that, in performing the Management Services that are the subject of its Agreement with MARS, it will promulgate a substance abuse policy and program covering its employees.  Upon MARS' request, Contractor will provide MARS with information concerning its policy and enforcement.  In addition, as with all individuals entering the Warehouse, Contractor will exclude from the site any contract-affiliated persons who are reasonably suspected of being under the influence of alcohol or other behavior-modifying drugs.

       H.    <u>Choice of Law; Forum</u>. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the state of Delaware without regard to its principles of conflicts of law.  Any dispute, controversy or claim of any nature arising out of or relating to this Agreement shall be adjudicated in either the Federal District Court or the State Trial Court of Delaware and the parties hereby consent (and waive any challenge or objection) to the personal jurisdiction and venue of said Court and state.  Seller expressly acknowledges and affirms that, for the purposes of applying the law of commercial and contractual transactions, the Uniform Commercial Code as adopted by Delaware shall be applicable.

       I.    <u>Financial Statements.</u>   Upon MARS' written request, but not more frequently that once a year, Contractor shall promptly furnish MARS with financial statements reflecting Contractor's then-current financial condition prepared in accordance with generally accepted accounting principles and certified by a corporate officer of Contractor.  Contractor represents and warrants that all financial and other statements and information supplied to MARS with respect to Contractor's business are true, correct and complete in all material respects, and that Contractor has and will maintain financial resources sufficient to full perform this Agreement.  Contractor shall promptly notify MARS of any material adverse change in its financial condition, any anticipated change in its corporate structure, and any threatened or pending litigation that may adversely impact the ability of Contractor to perform under this Agreement.

       J.    <u>Entire Agreement; Amendments</u>.    This Agreement together with the Appendices and Exhibits specifically referenced herein and attached hereto, as the same may be amended, modified or supplemented from time to time, embodies the entire understanding and agreement between MARS and Contractor in regard to the subject matter hereof, and entirely replaces and supersedes any and all other prior or contemporaneous agreements, contracts, understandings, conditions, or representations, oral or written, with reference to such subject matter. Except as otherwise specifically stated herein, no amendment or modification shall be of any force or effect unless:  (a) it is reduced to writing and signed by both parties; and  (b) is  expressly referred to as being an amendment or modification of this Agreement in such writing.

       K.    <u>Non-Solicitation</u>.  Except in the case of a termination of this Agreement by MARS pursuant to Section 13A or 13B, neither party, except by general advertisement, shall solicit or offer employment to any of the other party's employees who have been directly involved in this Agreement with a view to offering them employment either during the term of this Agreement or for a period of one (1) year thereafter without the prior written agreement of the other party.

       L.    <u>Preparation</u>.  This Agreement shall not be construed for or against either party by reason of or any presumption of preparation by such party, and both parties acknowledge that this Agreement has been fully negotiated between them.

DEF000021

M.    Attorneys' Fees. The prevailing party in any arbitration or other action to enforce any of the terms hereof shall be entitled, in addition to any other relief granted, to all actual out-of-pocket costs and expenses incurred by such prevailing party in connection with such action, including, without limitation, all reasonable legal fees, and a right to such costs and expenses shall be deemed to have accrued upon the commencement of such action.

N.    Counterparts; Facsimile Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and together shall constitute one and the same instrument. Facsimile signatures shall be as valid as the original signatures. Signatures delivered by facsimile shall be followed by delivery of the original signed document.

O.    Survival. Any obligation of a party that by its terms or nature arises at, or is intended to continue beyond, the expiration or termination of this Agreement or a Services Addendum shall survive the termination or expiration of this Agreement or Services Addendum.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

CONTRACTOR:                                          Mars Chocolate North America, LLC

_____                            _____
Signature                                            Signature
Dwight Crawley                                       STEVEN F. SHELDON
Typed Name                                           Typed Name
Chief Financial Officer                              COMMERCIAL MANAGER
Title                                                Title

    4 - 18 - 13                                          APRIL 22, 2013
_____                            _____
Date                                                 Date

Mgmt Agmt 2013                          22

DEF000022

**APPENDIX A**
To the
**WAREHOUSE MANAGEMENT AGREEMENT**
between
**MARS**
and


## <u>FINAL OPERATING BUDGET</u>

<u>Rates and Charges</u>:  MARS will pay Contractor for the Management Services in accordance with the rates and charges to be set forth in this Appendix A.

The final Operating Budget may be revised from time to time due to changes in the assumptions underlying the foregoing calculations, but only with the prior written approval of Mars, not to be reasonable withheld.

23

DEF000023

**APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

## SCOPE OF SERVICES

24

DEF000024

**EXHIBIT 1 TO APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**MARS' NORTH AMERICA QUALITY MANUAL**

DEF000025

**APPENDIX C**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

## OPERATING ASSETS LIST

The following are the Operating Assets for the purposes of Section 13H of the Agreement. This Appendix may be amended, modified, expanded or diminished only with the prior written consent of MARS. Any computer generated listing must be prepared in the following format:

DEF000026

**APPENDIX D**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**TRANSITION COSTS**

**Transition Costs:**

Contractor will incur certain costs and expenses during the transition period preparing to perform the Management Services ("Transition Costs"). MARS will pay Contractor for the Transition Costs in accordance with the rates and charges to be set forth in this Appendix D.

Prior to agreement between Mars and Contractor on the total Transition Costs, Contractor agrees to provide backup for Transition Costs as may be reasonably requested by Mars. At the conclusion of the sixty (60) day Transition period, Mars and Contractor agree to review and update the table set forth in Appendix D to reflect total actual Transition Costs, including approved Transition Costs in excess of or less than the total cost as set forth in this Appendix D.

DEF000027

**APPENDIX E**

**TO THE**
**WAREHHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**2013 Vendor Incentive to be added at a later date**

28

**Exhibit 3**

P.O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401

Phone 423-622-1113
Fax 423-643-3325
www.kencogroup.com



**KENCO**

April 2, 2013

MORRIS TYSON
P.O. Box 291
Kankakee, IL 60901

Dear MORRIS:

It is a pleasure to confirm our offer of employment to you. You will be employed at our KENCO MARS facility in Manteno, IL as a Yard Spotter on the 1st Shift.

Below are the details of the offer:

- Your start date is April 21, 2013
- Your starting base pay will be $16.55, per hour, paid weekly
- You are eligible for a transition bonus of $1300.00, to be paid out in $433.33 increments following your 30th, 60th and 90th day of employment. If your employment ends within 90 days, the increments that the transition bonus is paid will not be paid in a prorated amount.
- You will begin accruing PTO under Kenco's PTO policy on April 21, 2013.
- The rate that you will accrue PTO under Kenco's PTO Policy will be based off of your 4Ts anniversary date of 1/19/2004.
- Based on completion of defined goals, objectives, and overall financial performance of the Company you may receive an increase in your wage. This will be determined through annual performance evaluations with your manager.

Kenco will be paying for temporary health coverage during the first 90 days of employment through Starbridge. You will have 30 days to elect the coverage level, but regardless of when you enroll, both the coverage and the premium are retroactive to your start date. Enrollment in Starbridge will take place during your new hire orientation. Your temporary health care coverage will end on your 90th day of employment.

You are eligible for the company benefit program on your 91st day of employment. The company's benefit program includes medical, dental and prescription drug coverage, an employer-matched 401(k) plan, short and long-term disability coverage, group life insurance and PTO.

The offer of employment is contingent upon the completion of a successful pre-employment drug screen analysis and criminal background check. We reserve the right to withdraw this offer if the drug screen analysis result or the background check is unfavorable. Your employment with Kenco is at-will and either party can terminate the relationship at any time, with or without cause and with or without notice.



MORRIS, we are excited about you joining us at Kenco. Please indicate your acceptance of this offer by signing at the bottom of the letter and returning it to a Kenco Human Resource representative. Please retain a copy for your records. If you have any questions, do not hesitate to ask.

Sincerely,

*Tammie Pate, Sr. HR Mgr.  4-2-13*

_____    _____
Paula Hise - Kenco VP of Operations          Date

Offer Accepted:

*Morris J. Tyson*                                *4-2-13*
_____    _____
MORRIS TYSON                                     Date

**Exhibit 4**



January 27, 2015

<u>HAND DELIVERED</u>

Morris Tyson
P.O. Box 291
Kankakee, IL 60901

Dear Morris,                                    Position: Spotter

Kenco Logistic Services, LLC was recently informed by Mars that our logistic services
contract with them has been cancelled. As a result of this contract cancellation, we regret
to inform you that all Kenco Logistics Services regular, full-time and temporary associates
who are employed at 1125 Sycamore Street, Manteno, Illinois 60950 will be terminated
effective March 29, 2015.

All Kenco regular, full-time and temporary associates at this location will be terminated.
You have no "bumping rights." In other words, you cannot take another associate's
position. As part of the transition process, Mars' new logistics provider may allow
associates to apply for positions within their organization. Information pertaining to the
new provider will be presented to you through group meetings and notifications on the
bulletin boards throughout the facility going forward.

This notice is being given to you pursuant to the Worker Adjustment and Retraining
Notification Act of 1988. This Act requires employers to give official notice to affected
employees of a pending mass layoff or facility shutdown. Should you have any questions,
please contact Susan Denman at (423) 643-3396.

Sincerely,

*Mario Lopez*

Mario Lopez
General Manager

**Exhibit 5**



February 13, 2015

Dear Morris Tyson

Congratulations! We are pleased to confirm our offer for a full-time position with Exel effective **March 2, 2015**. This offer is contingent upon the execution of a signed contract with Mars which is expected prior to this transition date. You are also required to attend a new hire orientation. The date, location, and time of the new hire orientation will be announced soon. You will be paid for this time after you start with Exel.

Please review the following and indicate your acceptance by signing this copy and returning it to Amanda Dibblee, Human Resources or any of the other Exel HR representatives on site. Please return it as soon as possible, but no later than **Monday, February 16, 2015**.

| | |
|---|---|
| Title: | Yard Driver |
| Location: | Mars/Exel /Manteno, IL |
| Shift: | Wed – Sat 5:00am – 3:00pm |
| Hourly Rate: | $18.50** |

**If this rate is above Exel's Wage Progression, you will be paid this rate for a period of one year or until you reach Exel's wage rate, whichever is sooner. If after the one year, you are still above Exel's Wage Progression; your hourly rate will be no less than the 48 month step in your job category of the wage progression.

You will maintain your Kenco service date for the purpose of Health Benefits and Vacation. Your vacation eligibility for 2015 will be pro-rated based on your start date of March 2, 2015.

If you have any additional questions, please contact Amanda Dibblee, 630.338.2374.

Sincerely,

Exel Human Resources

I accept the position of a Full-Time Regular Exel associate.

_____          _____
Signature                                                    Date

Exhibit 6



May 26, 2015

**Exel**
1263 Windham Parkway
Romeoville, IL
60446

Telephone 630.771.0667
Facsimile  630.771.0490

www.exel.com

Mr. Morris Tyson
P. O. Box 291
Kankakee, IL  60901

Dear Morris:

We are in receipt of the Interactive Process Questionnaire that was completed by Doctor Wesley Choy on May 4, 2015.  Per his report you have a permanent restriction of a 25 pound weight limit and no repetitive activity with your left hand.  As we discussed in our meeting with Kim Daniels and Chris Moncrief on May 13, 2015, Exel is not able to accommodate these permanent restrictions in your position as a Yard Driver / Fork Lift Operator.  Therefore, as discussed you were separated from employment effective the end of your shift on May 13, 2015.

If you were enrolled in Be Secure Benefits, you will receive paperwork at your home that will provide information on your eligibility to continue healthcare coverage through COBRA.

As we also discussed, if at any time the restrictions are lifted, you are eligible to apply for reemployment under Exel's rehire policy.

Please feel free to call me with any questions or concerns you have.

Sincerely,

*Karol Boyd*

Karol A. Boyd
Area Human Resources Manager

Karol.Boyd@Exel.com
Tel      630.771.0667 ext. 20928
Fax      630.771.0490
Mobile  630.930.2217

Raising expectations

**EXHIBIT 7**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Chicago Direct Dial: (312) 872-9777
Administration Fax: (312) 588-1255
Enforcement/File Disclosure Fax: (312) 588-1260
Federal Sector Fax: (312) 588-1265
Intake FAX: (312) 588-1286
Legal Fax: (312) 588-1494
Mediation Fax: (312) 588-1498
Website: www.eeoc.gov

EEOC Charge Number: 21B-2016-00852

Morris Tyson
11528 South Halsted                                        **Charging Party**
Chicago, IL 60628


vs.


Exel Logistics
1125 West Sycamore                                         **Respondent**
Manteno, IL 60950


## DETERMINATION


Under the authority vested in me by the Commission's Procedural Regulations of the Equal
Employment Opportunity Commission (EEOC), I issue the following determination on the merits
of the subject charge filed under Americans with Disabilities Act, as amended (ADA) and Title
VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondent is an employer within the meaning of ADA and Title VII and all requirements for
coverage have been met.

The Charging Party alleged that he was discriminated against based on race, Black, disability and
in retaliation for engaging in protected activity, in that he was harassed, discharged, and his
unemployment benefits were denied, in violation of Title VII and the ADA

I have determined that the evidence obtained in the investigation establishes reasonable cause to
believe that Respondent discriminated against Charging Party based on his disability and in
retaliation for engaging in protected activity, by discharging him, in violation of the ADA.

This determination is final. When the Commission finds that violations have occurred, it attempts
to eliminate unlawful practices by informal methods of conciliation. Therefore, I invite the parties
to join with the Commission in reaching a just resolution of this matter. Disclosure of information

obtained during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 CFR Part 1601.26).

If the Respondent wishes to accept this invitation to participate in conciliation efforts, please notify your Commission representative within 14 days. You are encouraged to include proposed terms for a conciliation agreement. The remedies for violations of the statutes we enforce are designed to make the identified victims whole, and to provide corrective and preventative relief. These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation(s) and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process or the conciliation terms it would like to propose, we encourage you to contact the assigned Commission representative. Should there be no response from the Respondent within 14 days, we may conclude that further conciliation efforts in this matter would be futile or non-productive.

On Behalf of the Commission,

_10/27/2020__
Date

Wendy Martin  Digitally signed by Wendy Martin
DN: cn=Wendy Martin, o=Equal Employment
Opportunity Commission, ou=Enforcement
Supervisor, email=wendy.martin@eeoc.gov, c=US
Date: 2020.10.27 14:50:55 -05'00'  /for_____

Julianne Bowman
District Director



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Chicago Direct Dial: (312) 872-9777
Administration Fax: (312) 588-1255
Enforcement/File Disclosure Fax: (312) 588-1260
Federal Sector Fax: (312) 588-1265
Intake FAX: (312) 588-1286
Legal Fax: (312) 588-1494
Mediation Fax: (312) 588-1498
Website: www.eeoc.gov

EEOC Charge Number: 440-2016-04158

Morris Tyson                                                        Charging Party
11528 South Halsted
Chicago, IL 60628

vs.

Mars, Inc.                                                            Respondent
1125 West Sycamore
Manteno, IL 60950

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations of the Equal
Employment Opportunity Commission (EEOC), I issue the following determination on the merits
of the subject charge filed under Americans with Disabilities Act, as amended (ADA) and Title
VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondent is an employer within the meaning of ADA and Title VII and all requirements for
coverage have been met.

The Charging Party alleged that he was discriminated against based on race, Black, disability and
in retaliation for engaging in protected activity, in that he was harassed, discharged, and his
unemployment benefits were denied, in violation of Title VII and the ADA

I have determined that the evidence obtained in the investigation establishes reasonable cause to
believe that Respondent discriminated against Charging Party based on his disability and in
retaliation for engaging in protected activity, by discharging him, in violation of the ADA.

This determination is final. When the Commission finds that violations have occurred, it attempts
to eliminate unlawful practices by informal methods of conciliation. Therefore, I invite the parties
to join with the Commission in reaching a just resolution of this matter. Disclosure of information

obtained during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 CFR Part 1601.26).

If the Respondent wishes to accept this invitation to participate in conciliation efforts, please notify your Commission representative within 14 days. You are encouraged to include proposed terms for a conciliation agreement. The remedies for violations of the statutes we enforce are designed to make the identified victims whole, and to provide corrective and preventative relief. These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation(s) and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process or the conciliation terms it would like to propose, we encourage you to contact the assigned Commission representative. Should there be no response from the Respondent within 14 days, we may conclude that further conciliation efforts in this matter would be futile or non-productive.

On Behalf of the Commission,

10/27/2020
Date

Wendy Martin /for

Julianne Bowman
District Director

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Exhibit 8**

Morris Tyson,

       Plaintiff,

                                    Case No. 1:21-cv-03504

                                    Judge Sharon J. Coleman

       v.

Mars, Inc., Exel Logistics, and DHL Express,

       Defendants.

---

**DECLARATION OF MORRIS TYSON IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANTS MOTION TO DISMISS**

---

Morris Tyson, for his declaration, pursuant to 28 U.S.C. §1746, states as follows:

1.    I am over twenty-one years of age and am competent to testify to the matters set forth in this Declaration.

2.    The facts stated herein are within my personal knowledge and are true and correct.

4.    On the afternoon of June 24, 2021, I timely filed my complaint referred to as 1:21-cv-03504 with the Clerk of the Court by email at the Clerk's temporary email address.

5.    I was contacted by the Clerk's office that there was an issue with the electronic signature on the complaint.

6.    I promptly corrected this issue.

7.    I was left with the understanding from the Clerk's office that the it would be dated the day it was received.

1

8.   I emphasized to them that the complaint's filing date was June 24, 2021. Exhibit A

9.   I was again contacted by the Clerk's office, by email, indicating that there was now an issue with the civil cover sheet.  Exhibit B

10.  I promptly corrected the issue.

11.  I was still led to believe that the complaint would be dated the day it was transmitted/received by the Clerk's office, even if it was not filed on the day it was received.

12.  I acted responsibly doing all that I could within my power to assure the timely filing of my complaint.

13.  Due to a new procedure, that I was unaware of my email provider purged emails after reaching a particular number of emails.  Therefore, I was unable to demonstrate directly the day the complaint was electronically transmitted.  The attached emails Exhibits A and B were printed back in June so that I could comply with the checklist of items that needed attention.

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 30, 2021                         Respectfully submitted

                                                  Morris Tyson
                                                  /s/ Morris Tyson_____
                                                  Morris Tyson
                                                  1955 Meadowview Ave.
                                                  Kankakee, IL 60901
                                                  Tel: 815/295-4592
                                                  E-Mail: Morris60901@yahoo.com
                                                  Plaintiff ( *pro se* )

2

**Exhibit A**

Chicago, IL 60604

*Your opinion is important to us* click HERE to take our customer service survey

---

**From:** morris tyson <morris60901@yahoo.com>
**Sent:** Friday, June 25, 2021 11:59 AM
**To:** Temporary E-Filing <Temporary_E-Filing@ilnd.uscourts.gov>
**Subject:** morris60901@yahoo.com

==**CAUTION - EXTERNAL:**==

I would appreciate getting this document file asp I sent it the wrong way yesterday Thank you Morris Tyson 815-295-4592

==**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.==

Exhibit B

# RE: morris60901@yahoo.com

From: Temporary E-Filing (temporary_e-filing@ilnd.uscourts.gov)

To: morris60901@yahoo.com

Date: Friday, June 25, 2021, 01:23 PM CDT

Good Afternoon,

Before we can proceed with opening your civil case please note formatting issues below that need to be corrected.

## CIVIL COVERSHEET

- Please complete Section II. Basis of Jurisdiction by checking one appropriate box.
- Accordingly Section III should be completed only if 4 is selected in Section II.
- Please note that in Section IV. Nature of Suit you should check only ONE box.
- Please sign and date the form

## COMPLAINT

- Please sign the form.

Regards,

Catrina Livermore

Operations Specialist

U.S. District Court for the Northern District of Illinois
219 S. Dearborn Street
Chicago, IL 60604

*Your opinion is important to us* click HERE to take our customer service survey

**From:** morris tyson <morris60901@yahoo.com>
**Sent:** Friday, June 25, 2021 11:59 AM

**Exhibit 9**



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Chicago District Office

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Chicago Direct Dial: (312) 872-9777
Administration Fax: (312) 588-1255
Enforcement/File Disclosure Fax: (312) 588-1260
Federal Sector Fax: (312) 588-1265
Intake FAX: (312) 588-1286
Legal Fax: (312) 588-1494
Mediation Fax: (312) 588-1498
Website: www.eeoc.gov

Morris Tyson
c/o Jordan Hoffman P.C.
2711 East New York St. #205
Aurora, IL 60502

Re:     Charging Party:     Morris Tyson
        Respondent:         Exel Logistics
        EEOC Charge:        21B-2016-00852

Dear Mr. Tyson:

Attached please find a Notice of Right to Sue issued on your behalf in the above referenced matter. The Commission's efforts to conciliate this matter with Respondent have been unsuccessful. The Commission has determined that it will not bring a lawsuit against the Respondent. By issuing the attached Notice of Right to Sue, the Commission is terminating its processing of your charge.

The attached Notice of Right to Sue entitles you to pursue private litigation concerning your allegations against Respondent(s) within 90 days of your receipt of this letter. You may wish to retain a private attorney at this time.

If you do file suit based on this Notice of Right to Sue, it is requested that you provide us with a copy of the complaints you file in court.

On Behalf of the Commission:

1/20/2021                                    *Julianne Bowman/eh*
_____                    _____
Date                                        Julianne Bowman
                                            District Director

Enclosure(s)

EEOC Form 161-A (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE
### *(CONCILIATION FAILURE)*

| | |
|---|---|
| To:  **Morris Tyson**<br>**c/o Jordan Hoffman P.C.**<br>**2711 East New York St. #205**<br>**Aurora, IL 60502** | From:  **Chicago District Office**<br>**230 S. Dearborn**<br>**Suite 1866**<br>**Chicago, IL 60604** |

☐  *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **21B-2016-00852** | **Eva Baran,**<br>**Investigator** | **(312) 872-9681** |

### TO THE PERSON AGGRIEVED:

This notice concludes the EEOC's processing of the above-numbered charge.  The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you.  In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case.  This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/eh*                                               1/20/2021

Enclosures(s)                          **Julianne Bowman,**                      *(Date Mailed)*
                                       **District Director**

cc:

**Exel Logistics**
**c/o Anthony White**
**Thompson Hine LLP**
**41 South High Street #1700**
**Columbus, OH 43215**

EEOC Form 161-A (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE
*(CONCILIATION FAILURE)*

| To: | Morris Tyson<br>c/o Jordan Hoffman P.C.<br>2711 East New York St. #205<br>Aurora, IL 60502 | From: | Chicago District Office<br>230 S. Dearborn<br>Suite 1866<br>Chicago, IL 60604 |
|---|---|---|---|

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2016-04158 | Eva Baran,<br>Investigator | (312) 872-9681 |

### TO THE PERSON AGGRIEVED:

This notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/eh*                                                   1/20/2021

Enclosures(s)

**Julianne Bowman,<br>District Director**                                   *(Date Mailed)*

cc:

**Mars, Inc.<br>c/o Anthony White<br>Thompson Hine LLP<br>41 South High Street #1700<br>Columbus, OH 43215**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Chicago Direct Dial: (312) 872-9777
Administration Fax: (312) 588-1255
Enforcement/File Disclosure Fax: (312) 588-1260
Federal Sector Fax: (312) 588-1265
Intake FAX: (312) 588-1286
Legal Fax: (312) 588-1494
Mediation Fax: (312) 588-1498
Website: www.eeoc.gov

Morris Tyson
c/o Jordan Hoffman P.C.
2711 East New York St. #205
Aurora, IL 60502

Re:     Charging Party:     Morris Tyson
        Respondent:         Mars, Inc.
        EEOC Charge:        440-2016-04158

Dear Mr. Tyson:

Attached please find a Notice of Right to Sue issued on your behalf in the above referenced matter. The Commission's efforts to conciliate this matter with Respondent have been unsuccessful. The Commission has determined that it will not bring a lawsuit against the Respondent. By issuing the attached Notice of Right to Sue, the Commission is terminating its processing of your charge.

The attached Notice of Right to Sue entitles you to pursue private litigation concerning your allegations against Respondent(s) within 90 days of your receipt of this letter. You may wish to retain a private attorney at this time.

If you do file suit based on this Notice of Right to Sue, it is requested that you provide us with a copy of the complaints you file in court.

On Behalf of the Commission:

_1/20/2021_
Date

_Julianne Bowman/eh_
Julianne Bowman
District Director

Enclosure(s)

**CHICAGO DISTRICT OFFICE**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**230 S. DEARBORN, SUITE 1866**
**CHICAGO, ILLINOIS 60604**

**OFFICIAL BUSINESS**

S SUBURBAN IL 604

26 MAR 2021 PM 3 L



60502-954855